1

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No. 2:23-cr-01307-JJT |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | November 22, 2023 |
| **Cesar Humberto Rivera,** | ) | 2:02 p.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE JOHN Z. BOYLE, MAGISTRATE JUDGE**

**TRANSCRIPT OF PROCEEDINGS**

**DETENTION HEARING**

**APPEARANCES:**

For the Plaintiff:
    US Attorneys Office
    By:  Sheila Phillips, Esq.
    40 North Central Avenue, Suite 1800
    Phoenix, Arizona 85004

For the Defendant:
    Ralls & Wille P.C.
    By:  Grant D. Wille, Esq.
    314 S. Sixth Avenue
    Tucson, Arizona 85701

Transcriptionist:
Scott M. Coniam
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 43
Phoenix, Arizona 85003-2151
(602) 322-7257

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

**E X H I B I T S**

| NO. | DESCRIPTION | REC'D |
|-----|-------------|-------|
| 1 | Rule 5 Detention Memo | 4 |
| 2 | Photo of the Machinegun RIVERA attempted to purchase in August | 4 |
| 3 | Stock Photos of the M-2 .50 Caliber Rifle ATF seized from RIVERA in June of 2022 | 4 |
| 4 | Criminal Complaint | 4 |

UNITED STATES DISTRICT COURT

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  This is criminal case number 23-1307, the United States of America vs. Cesar Humberto Rivera, before the court for a detention hearing.

MS. PHILLIPS:  Good afternoon, Your Honor.  Sheila Phillips appearing on behalf of the United States.

THE COURT:  Good afternoon.

MR. WILLE:  Good afternoon, Your Honor.  Grant Wille on behalf of Mr. Cesar Rivera, he's in custody to my right. He's being assisted by the court's interpreter today.

THE COURT:  Good afternoon.

Mr. Rivera, good afternoon.

THE DEFENDANT:  Good afternoon.

THE COURT:  We're here for a detention hearing.  It looks as though he has family here in the courtroom; is that correct?

MR. WILLE:  Yes, Your Honor.

THE COURT:  Who is here?

MR. WILLE:  We've got his wife, Josseline, who wrote a letter.  We've also got her mother, Aimme, who wrote a letter. And then the minor 13-year-old younger sibling.

THE COURT:  Thank you.

All right.  Good afternoon to all of you.

We're here for the detention hearing.  To determine if someone is released or detained, the parties will argue to the

court.  Each party submitted memoranda to the court and exhibits.  I've reviewed all of them.  I've read all of the letters, all the attachments, and the defendant's submission.

There are also exhibits that the government has. There are four of them.  One of them is the criminal complaint.

Mr. Wille, have you reviewed all of the government's exhibits?

MR. WILLE:  I have.

THE COURT:  Okay.  Any objection to their introduction for this hearing alone?

MR. WILLE:  No, Your Honor.

THE COURT:  All right.  Exhibits 1 through 4 are admitted and I've reviewed them.

Okay.  With that, because the government has the burden, they begin, then Mr. Wille will speak.

If the government has anything to add, I'll always give your attorney the last word, Mr. Rivera.

With that, Ms. Phillips.

MS. PHILLIPS:  Your Honor, it's the government's position that Mr. Rivera should be detained pending trial.

Information has come to the government's attention that he is at least a midlevel facilitator of firearms trafficking, at least some of those firearms heading to Mexico. He has been involved in brokering multiple deals of .50 caliber firearms, which are a firearm that's very popular with Mexican

drug cartels.  It's not something that one would buy for their personal use.

In terms of Mr. Rivera's financing -- finances, his wages do not reflect if he would even be able to afford some of these weapons.

In the present case, he is charged with possession of a machine gun.  This case originated based on another investigation involving his codefendant, Mr. Ramirez-Zavala, and the basic facts of that case are outlined in the affidavit to the complaint.  Mr. Ramirez-Zavala was at least a midlevel facilitator of firearms trafficking.  He came to the attention of ATF as well as HSI.  They had several conversations with him.  It was known to them that he was recruiting people to purchase firearms, specifically large caliber firearms, and trafficking them to Mexico.

And Mr. Rivera was not unknown to law enforcement at the time that he attempted to purchase the machine gun.  He indicated -- he showed up at the controlled buy.  And indicated, post-Miranda, that he was the person who was purchasing the firearm and -- and it was $14,000 and -- and he supplied $10,000 cash towards the purchase of the firearm.  He was with Mr. Ramirez-Zavala, who was facilitating the deal apparently either for Mr. Rivera or for someone else that Mr. Rivera was going to deliver this high caliber firearm to.

The government's Exhibit Number 2 shows the type of

machine gun that Mr. Rivera was attempting to purchase.

In addition to that, Exhibit Number 3 shows photos of another .50 caliber firearm.  And these are stock photos, but they are photos of the type of firearms that Mr. Rivera possessed back in June of 2022.  At that time, ATF went to his house.  He had used a false address.  And they took -- they seized this weapon.  At that point he was warned that he should not be engaging in straw purchases of firearms and he continued to continue in this behavior.  We know that because of his involvement in the investigation out of the District of Utah.  Several individuals were indicted.  Mr. Rivera is under investigation.  At this point I think it's likely that he'll be indicted, although that indictment has not yet come.  It's law enforcement's belief that he was the individual who was recruiting the purchasers out of the State of Utah and those purchasers had a number of high caliber firearms.  They purchased a number of high caliber firearms.  And the details of that investigation are set forth in government's Exhibit Number 1, which is the detention memo that was filed by the AUSA who's handling that particular investigation out of the District of Utah.

Mr. Rivera was arrested in the District of Utah.  He was staying at the home of one of the codefendants and that's how he got picked up.  He had made representations that he was there because he was hiding out because he knew that there was

an open -- there was a warrant.

The government also has reason to believe that he's a flight risk not only because he was hiding in the State of Utah but additionally because he has made several trips down to Mexico.  He has strong ties with the district of Mexico.  And based on the severity of the charges and the fact that this has not been just an isolated incident, that it's been going on for some time, the government believes that he is both a flight risk and a danger.

THE COURT:  I have a number of questions.  Let me start with one of the last statements you made about him going to Utah.  You referenced that he might be hiding out.  How do you come about that information?

MS. PHILLIPS:  It's a statement that was made by one of the individuals who was arrested.

THE COURT:  And they said that Mr. Rivera went to Utah to hide?

MS. PHILLIPS:  Well, Mr. Rivera was not arrested initially when the other individuals were arrested because -- my understanding is the arresting officers were unaware of the warrant.  And then it came to their attention that -- that there was a warrant.  He was initially taken into custody by local police, I believe, and then released.  And the officer -- the HSI officers -- agents went back and arrested him.

THE COURT:  You're telling me in Utah he was arrested

by local police in October and then --

MS. PHILLIPS:  No, Your Honor.

THE COURT:  -- are you --

MS. PHILLIPS:  Yes.  In October, yes.

THE COURT:  All right.  And then within a day or two, HSI agents -- how long after did they go back and arrest him?

MS. PHILLIPS:  Let me verify with the agent who's behind me.  I believe it was the same day.

THE COURT:  And let me ask how difficult it was for them to find him?

MS. PHILLIPS:  Your Honor, HSI had been looking for him since the arrest warrants and they were unable to find him. And I was told by the case agents that they had a strong belief that he was in Mexico at that time and they were unable to arrest him.

THE COURT:  Please talk to your agent because my question is, if local law enforcement arrested him, why would he return back to the same residence if he was a flight risk? So why don't ask you him --

MS. PHILLIPS:  Thank you, Your Honor.

THE COURT:  -- see if you have the information.

(Pause.)

MS. PHILLIPS:  Your Honor, I've confirmed that the arrest was made the same day.  Initially local police department did arrest Mr. Rivera.  There was some kind of

administrative glitch and they released him.  He did go back to the same residence.  HSI went and arrested him there.

THE COURT:  And what was he arrested for that day?

MS. PHILLIPS:  He was arrested for the warrant on this particular case.

THE COURT:  Okay.  Why would they arrest him on a warrant and then release him?

MS. PHILLIPS:  Well, I don't know why the local police department released him, but -- but there was a warrant out for his arrest at the time that he was arrested --

THE COURT:  Right.

MS. PHILLIPS:  -- on the case that he's currently indicted.

THE COURT:  Right.  A federal warrant was effectuated by local police but then they released him?

MS. PHILLIPS:  No.  The warrant -- they were going to the house because it was the residence of one of the codefendants --

THE COURT:  Correct.

MS. PHILLIPS:  -- to pick up the individuals who were indicted on the Utah case and there were arrest warrants for that -- for their arrest.

THE COURT:  But you said they arrested Mr. Rivera as well?

MS. PHILLJIPS:  They did.  That's what I was told.

THE COURT:  And why would they arrest him if he wasn't one of the people who was on that other matter?

MS. PHILLIPS:  Maybe they weren't aware of that.  Let me ask the agent again.

THE COURT:  Okay.

(Pause.)

MS. PHILLIPS:  Your Honor, he was initially arrested once law enforcement found that he was in the residence.  I believe the residence belonged to a cousin.  He is one of the individuals who is part of the indictment out of Utah.  He had made indications that his cousin was back at the house, so they went back and arrested him, local police.  They were unable to verify the federal warrant when he was taken into custody and released him.  However, HSI was notified and went back to the house and arrested him.

THE COURT:  Okay.  I asked that because it appears then they were arresting him for this indictment, not for some other crime that was happening in Utah at the same time.

MS. PHILLIPS:  That is correct.

THE COURT:  All right.  My next question -- and I'll hear from the defense on their -- defense's response to this allegation that he was difficult to find in Utah.  Of course I don't know which is why I'm asking.

And I've read your memo, Mr. Wille, about efforts made to contact the marshals and other things, so I'll give you a

chance to respond.

My next question is about his wage history.  Your memorandum indicates that if -- he did not have, if I read it correctly, any wage or data history, but the pretrial report indicates that he had worked at Federal Express for two years, which they would have wage history for --

MS. PHILLIPS:  Your Honor, the memorandum was written by the AUSA in Utah.  My recollection is he did have a couple of quarters of wages; they were not significant.

THE COURT:  And do you know if they were for a Federal Express?

MS. PHILLIPS:  Your Honor, I don't have that documentation in front of me but it very well could be the case.

THE COURT:  He admitted his involvement when he was arrested on August 17th, so I don't know if there's, at least for this hearing, a dispute from the government that he was acquiring firearms for other people and he knew it was a machine gun.

Again, I'll hear from the defense, but that's -- so I don't know that his wage history is a significant fact, but it was raised and I was curious if there was information one way or the other.  It looks like it's mixed.

Okay.  My next question is about the June 22nd, 2022 -- pardon me -- the June 2022 arrest for a straw purchase.

I think you referred to that.  And is that the case where you said he received a warning and was released?

MS. PHILLIPS:  Yes, Your Honor.

THE COURT:  That involved an M-2; correct?

MS. PHILLIPS:  Your Honor, yes.  It was a large caliber firearm which is -- the picture of that is a .50 caliber firearm --

THE COURT:  Correct.

MS. PHILLIPS:  -- in Exhibit Number 3.

THE COURT:  So why -- given the significance of that firearm and its potential danger, why would he be not charged with a 4473 violation?

MS. PHILLIPS:  Your Honor, at that time he -- there was -- there was evidence that he was using a false address on the 4473.  There was no evidence that he had ever lived in that house.  He had a driver's license from that address.  But because of the lack of criminal contact prior to that, ATF agents instead seized the firearm and indicated to Mr. Rivera that straw purchasing was against the law and gave him a warning letter.

THE COURT:  All right.  That's fair.

Finally, you indicated that he might be indicted in Utah for his involvement in what's contained in your memorandum.  Are there any facts related to his potential connection to that case that are not in your memorandum you

want me to consider?

MS. PHILLIPS:  Yes, Your Honor.  It's my understanding from correspondence with the agent in Utah as well as the prosecutor that there is evidence on the phone that -- I believe it's the phone Mr. Rivera had on his person -- when he was arrested, they have the warrant to search that phone and the search of that phone is ongoing, but there were at least one text message string that would indicate that -- that he was involved with this group that were buying high caliber firearms.

THE COURT:  And that investigation, I believe, was from January of '23 up through August.  Is there any evidence of any conduct after August 17th, the day he was interviewed by law enforcement in this indictment?

MS. PHILLIPS:  Your Honor, not specifically.  However, his arrest happened after the incident with the machine gun and he was in Utah with the codefendants -- at least one of the codefendants.

THE COURT:  Okay.  Thank you.  I may come back to you.

Mr. Wille, that was a lot from the government.  I'll take notes on everything you say as well.

MR. WILLE:  I appreciate it, Your Honor.

THE COURT:  Go ahead.

MR. WILLE:  I just -- I have a lot of things that I want to cover but before I forget, I want to address the

allegation that one of the individuals in Utah said that my client was hiding out.  That's not been disclosed to me as far as I know.

Also an overarching theme that I see in this case is generally miscommunications and then I think also miscommunication stemming from the Spanish language barrier.  So I would just want to take that allegation with a big grain of salt because all the other context shows that my client was not hiding out, has never been hiding out since his arrest in August.

THE COURT:  So I take everything with a grain of salt, especially for a hearing like this where hearsay is admissible, but there was a statement as well made that law enforcement had difficulty finding him for more than a month.  And you may have an answer as to whether or not -- when you sent letters, for example, that I reviewed, to the potential prosecuting agencies and others, they would not have had from those any address in Utah.

Is there any information they would have known where he was in Utah or how they could have easily acquired that?

MR. WILLE:  Yeah.  I mean, I think the simple answer is they could have just called me.  I was in contact with him the whole time.  That's why we send those letters.

Now, I am never going to again assume that sending a letter means that the government or law enforcement are

actually on notice because obviously they didn't call me.

THE COURT:  But they would be tipping off a potential person they're seeking by calling a lawyer and saying we're looking for this person.

MR. WILLE:  Sure.

THE COURT:  I can understand why they might not want to do that, so I'll, again, take both of those sides.  But can you tell me objectively is there information they would have known about where he was staying in Utah, outside of anything you might have given them?

MR. WILLE:  Sure.  Two points I want to address.  One is all of this confusion about him being on the lamb I think just stems from the fact that he went -- had to go to Mexico pretty shortly after his initial arrest and I've explained why.

THE COURT:  To finish the divorce.

MR. WILLE:  Right.  But from the outside, I think agents maybe saw that and just presumed he was gone.  I don't know if they were looking anymore.

THE COURT:  I have no --

MR. WILLE:  Right.

THE COURT:  -- problem with his Mexico trip.  He has ties to Mexico.  But I am --

MR. WILLE:  Yes.

THE COURT:  -- a little concerned that someone who lives in Arizona might be in Utah and be arrested there.

MR. WILLE:  Right.  So that was just a quick trip.  He had just arrived up there in Utah.  That's his cousin that he was with.  He explains to me that, you know, this was about a vehicle that he had brought up there for them.  I don't think he had spent any time at all -- and I know that his family here have, you know, stated that he's been -- was in Arizona the entire time other than the one trip to Mexico for the divorce which we've explained.

THE COURT:  Explained.  Thank you.

MR. WILLE:  So I really don't understand why there was so much difficulty.

But, again, I'm really frustrated with myself that I couldn't have just resolved all of this.  And I understand the idea of not wanting to tip somebody off, but I think the only reason that they had concern about that sort of thing was because of their misinterpretation of the Mexico trip.  So I think that's how all that confusion started.

THE COURT:  Did they know about the Mexico trip, to your knowledge?

MR. WILLE:  Yeah.  So they -- when -- in Utah, I was playing like, you know, behind-the-scenes quarterback for the Federal Public Defender up there and one of the allegations was he was a flight risk because he had gone to Mexico.  And so I asked him about that and we also then explained, oh, that was just for his divorce.  I got -- I scrambled to get the

paperwork together and I gave that to them.  And that's why the Utah memorandum, I believe, doesn't talk about that at all. But from my initial conversations with the government at the beginning of all this after the October arrest, that is where all this suspicion -- suspicion stemmed from.  Now that I've explained that, they keep running with that claim, but I don't understand why.  And, again, you know, my fault for not hounding them more, but I did send letters saying just call me. So I don't know what else to do.  Like, I don't know how to be more proactive other than I will always be checking PACER every week from here on out on cases.

THE COURT:  I don't fault either one of you.  I can understand why you are frustrated and I can understand, like you said, them not wanting to tip someone off.

MR. WILLE:  Right.

THE COURT:  I don't know there's a perfect answer.

Go ahead.

MR. WILLE:  So I'll jump into the meat of my argument.

What I hear from the government is an argument about -- mostly about the weight of the evidence, which is the least most important factor, this issue with Utah, and then I suppose they're now also arguing both flight risk and dangerousness is what I heard.

So in this case, he's absolutely not a flight risk. He's got strong family ties who are sitting behind me right

now.  He's been in this community for several years.  He has citizenship here.  What's striking to me is he had the ability to run to Mexico and he has ties there, as everybody acknowledges, and so he would have the capacity to stay there, I suppose, but he made a conscious decision to remain in Arizona and essentially double down on his life here, getting a new rental agreement, you know, these English classes.  They're really, you know, interested in doing this food truck thing. And he hired me.  Right.  So he -- I assume people with much more community ties here, people who are born and raised in Phoenix who show less commitment to staying around as opposed to my client who certainly the government can say he has ties to Mexico and things like that, but everything he's done since August 17th -- there's no evidence that he's committed any other, you know, offense since that time that he's been -- his conduct has been totally lawful.  He's been engaged with me. We've been trying to get in touch with them.  Everything that he's -- and his own -- the rental agreement and the college, all that shows that he is committed to Arizona and his family here.

Also, quickly want to note, he has a job offer pending for him.  The second he gets out, he can get back to work.

THE COURT:  Is that the construction company?

MR. WILLE:  Yeah.  Yeah.

He has no history of mental health, drug or alcohol

abuse.  No criminal history.

So, again, you know, this is better than I get from most people who have lived here their whole lives.  Like, he's got a stronger reason to be here.  He has proved that he's engaged.

As to the weight of the evidence, I have a lot of nitpicking that I want to do, but I want to start by saying, again, it is the least important factor.  And to the extent that I'm talking about it, I am talking about the evidence to the extent that my client has a reason to stick around and fight.  Like, this is not a hopeless case.  I have things that I want to litigate and so there is reason for him to stay around.

THE COURT:  So I think it's a very close call and you may have the slightly better argument on flight risk.

I -- under the Bail Reform Act, there are a lot of arguments you have that you've already expressed.

I -- my stronger concern is the potential danger of anyone being involved in multiple machine gun sales not for themselves but knowing they're likely to go to Mexico which has, I think, been established here, on more than one occasion having been previously warned not to do this.  Also, from June '22 where it was an M-2 .50 cal.

MR. WILLE:  Right.  I would love to address all of that.

THE COURT:  Yeah.  Thank you.

MR. WILLE:  Absolutely.  And I see you looking at the clock.  I'll hurry up.

THE COURT:  No, no.  You're fine.  I'll give you as much time as you need.  This is his -- this is his hearing.

MR. WILLE:  Okay.  I appreciate it.

So I said at the beginning that a running theme here is sort of miscommunication.  To start out with, I wanted to note sort of this bait-and-switch situation that I see that keeps coming up.  There's obviously a difference between an automatic and a semiautomatic weapon.  One is illegal under the statute that he has been charged with.

The communications with the codefendant Zavala with the undercover agent, I don't know if you picked up on this, but they were talking about an FN M249-S which is not an automatic weapon.

Also, there are statements by HSI Agent Cook and from ATF Agent Villarreal who said that the "minimi" -- I guess that's sort of an abbreviation, but it is slang -- one of them uses the term slang, the other one uses a vernacular term for the same semiautomatic weapon, the FN M249-S.  And so that changes the whole character of what's being alleged, particularly because these individuals are speaking Spanish.  I think interpretation is being done by a minor.

Rivera allegedly confessed in a post-Miranda statement

that he had provided the money ahead of time by which time they would have been thinking about this semiautomatic weapon, I believe.

The same thing happens -- oh.  Right.  So my point is, all the conversation up to that point was about a semiautomatic weapon and then when they get into that warehouse, they show him an M60, I guess.  So, you know, we've got a Miranda issue there.  We've got interpretation issues there.

THE COURT:  Well, I don't consider Miranda issues here.

MR. WILLE:  Right.  But my point, again, is that we have things to fight.

THE COURT:  Okay.

MR. WILLE:  So there's a reason for him to stick around, have hope in this case.

I wanted to say the same thing happened with the June '22 firearm that was seized.  The exhibit list says it's a machine gun but the Utah filing clarifies that it's a firearm that's capable of being converted to a machine gun but not that it necessarily was.

THE COURT:  I think that's correct.  I don't know that he'd have the ability to purchase a fully automatic M-2 in June of '22.

MR. WILLE:  Right.

THE COURT:  Ms. Phillips, my understanding is that was

a semiautomatic M-2.

MS. PHILLIPS:  That is correct.

THE COURT:  Okay.  But let me see if I heard your point.  Have you addressed the August 17th undercover sale which was for a machine gun?  Are you suggesting that there was a misinterpretation in that transaction?

MR. WILLE:  Well, here's the disadvantage that I'm at is that I don't have the recordings, right, and that's where the Spanish interpretation issues always come up.

THE COURT:  Okay.

MR. WILLE:  So very interested in getting all of that.

But I did want to note that the agents' own writing in the reports and whatnot say, you know, explicitly they were talking about this semiautomatic weapon and then when the guys arrived at the warehouse, apparently they showed them the M60.

So I don't want to get too deep into the details there.  My point is just that this is a running theme.  The same thing happened with the June '22 firearm that is a semiautomatic, although the government keeps referring to it as a machine gun.

As to your specific concern on what happened that day --

THE COURT:  This is August?

MR. WILLE:  June --

THE COURT:  Oh.  June 22nd?

MR. WILLE: -- 2022 with the M-2.

THE COURT: Okay. Go ahead.

MR. WILLE: So they state that he made a false statement on the 4473 regarding his address. So I've shared with the government a copy of his driver's license at that time. He put his driver's license address down where he -- that is connected to his house. So --

THE COURT: Hold on. That doesn't matter. You could have a false address on a license or move and have your old license. What's important is --

MR. WILLE: Right.

THE COURT: -- was the address on his license his address?

MR. WILLE: Right. So he was living there. You know, that was where he was living. He had moved recently.

And I think the concern here in raising that is did he have criminal intent? Was he trying to evade law enforcement by using that address?

Well, if they had just run a driver's license check here in Arizona, they would have seen it linked to him still. So maybe negligence, maybe stupid, maybe ignorance of how the form goes but not criminal intent.

THE COURT: How about the fact that he was buying another M-2 and there's really no history of him ever buying M-2s for himself that I'm aware of. But given all the pattern

we have here in Arizona and Utah, you know -- and Utah is less connected than August 17th, but that he was involved with an M-2 purchase likely for someone else back then?

MR. WILLE:  Well, I don't think that there's any context at that time that he was involved with straw sales or being a midlevel distributor, right.  There's Utah which doesn't go back that far.  There's our case.  But this June 2022 case is separate when he was working at a firearms dealer at that time is my understanding.

Also, respectfully, I'm a defense attorney.  The burden's not on me here on this point.  Whether there's additional evidence to help illuminate or give me more context, I don't know.  So I'm, again, at sort of a disadvantage.  I appreciate the concern but --

THE COURT:  It is an inference and I get that it's attenuated given that it's a year before.  I just have evidence that a person is involved in the straw purchase of these --

MR. WILLE:  Well --

THE COURT:  -- firearms in '23 and the year before he's also buying an M-2 which is similar.

MR. WILLE:  Right.

THE COURT:  I think I could infer that that also wasn't for him.

MR. WILLE:  Certainly.  And the government referred to that, I think, as a straw purchase but there's actually no

UNITED STATES DISTRICT COURT

evidence of that.  Right.  It's -- the only wrongdoing there that's been alleged is that he put the wrong address.  And we have explained --

THE COURT:  Okay.

MR. WILLE:  -- the circumstances of that.

In addition, there's a brief reference in the Utah memorandum regarding a 9mm.  I don't know if the court saw that.

THE COURT:  I did.  And it was fired at a house and it was connected to the handgun he possessed.

MR. WILLE:  Right.

And so prior to this, I thought that the government was alleging only flight risk.  They've mentioned dangerousness and the court is concerned about that as well.  I wanted to point out that the materials regarding that event have not been disclosed to me yet.  I think it's absolutely not relevant to flight risk.

And as to dangerousness, the difficulty here is that I have reason to believe that that firearm was recently purchased like, you know, potentially days before his arrest.  So at this point, I don't have, you know, anything to present regarding that, but --

THE COURT:  Do you think you'll have documentation of that?  I don't want to --

MR. WILLE:  Well, what --

THE COURT:  I just want to say because I -- even though there's no disclosure, they said they have a NIBIN connection of that shell casing to the home and --

MR. WILLE:  Right.

So if it had been sold thereafter, if an individual used the firearm and then sold it, which is a common thing --

THE COURT:  Sure.

MR. WILLE:  -- that would make sense.

My understanding is that my client had recently purchased that a couple days prior.

THE COURT:  Okay.

MR. WILLE:  And I'm very interested in whether Phoenix Police had any leads as to that event because, again, nothing's been disclosed to me and I'm lacking all context as to what was going on there.  And so, frankly, for that reason, because I literally have nothing to work on compared to the other events, I'd ask the court not to consider that issue or not to give it much weight at a minimum.

THE COURT:  I agree with that.  I don't know how much weight I could give it.  I don't know I'd discount it completely, but I also don't know of any proof that would suggest he -- right now that we know he bought it a few days before --

MR. WILLE:  Right.  Right.

THE COURT:  -- because you don't have it -- haven't

had the time for disclosure.

MR. WILLE:  Right.  We don't know if it was him.  We don't know if he bought it but, again, the burden of proof is on the government so I think it's sort of a wash on that issue.

THE COURT:  I don't actually know anything about the discharge at the house either.  For all I know it was an accidental discharge.

MR. WILLE:  Exactly.

THE COURT:  So I'm not sure --

MR. WILLE:  Exactly.

THE COURT:  -- what weight to give that either.

Go ahead.

MR. WILLE:  So we've covered the June 2022 M-2.  We've covered the 9mm.  We've covered the issue with, you know, semiautomatic firearms being referred to as machine guns several times.

As to the Utah case, you know, I'm not quite sure how to deal with that because they were investigating that case.  Apparently they were affecting arrests in that case.  They allege that they had evidence regarding that case and my client is not indicted.

THE COURT:  But there's a phone -- I agree with all of that.

The evidence is that those people who are indicted had his number and they referenced him specifically by name as the

person to connect with if you want to purchase a firearm.

MR. WILLE:  Right.  Right.  So once again, at a disadvantage because I don't have disclosure on this matter.

THE COURT:  Sure.

MR. WILLE:  You know, from my perspective, he is -- there's at least some reason for them to have not brought charges at this point.  They can in the future and at that point they can also impose conditions of release or detention as to that case.  So that would be my main point on that issue.  You know, if the government is confident that they are going to bring charges, I'm going to get a lot more disclosure where all that issue is going to be fleshed out.  I don't have the cell phone, you know, information.

But what I do know is that on the day of his arrest in October, he was calling my personal cell phone.  And I was trying to get ahold of local law enforcement there and we're trying to do absolutely everything that was right.  And when police came to that house, he, without any incident, came on out just like I told him to.  So even accepting as true the Utah allegations, those all predated the August 17th arrest.  And since August 17th, he's been absolutely engaged with me and we have tried to demonstrate his willingness to participate in all of this.  I think if I had found that indictment, we wouldn't be here at all.  I would have just asked for a summons.  But this mess comes out of a simple misunderstanding.

And to the extent that the government is talking about dangerousness or that the court is concerned about dangerousness, at this point since -- you know, he had law -- two law enforcement contacts and was arrested. There's no indication for several months now -- well, I mean, he was arrested in October, but during that time period, no allegation of ongoing activity or anything dangerous of that sort.

THE COURT: Okay.

MR. WILLE: And specifically on that point, I imagine that we could have plenty of conditions targeting exactly that concern, like don't go to a firearm dealer. Report any transaction over $1,000. I feel like pretrial services would be more creative than I am, but I believe that we could do, you know, conditions of release to address that specific concern regarding dangerousness that the court might have.

So in the end, I just want to come back again. He's tried to do everything that he could -- or he tried to do everything that he could prior to his arrest in October.

I would like to know if, you know, there's anything else we could have done in the future to make this any better.

But this is one of those cases where I have a client who's really connected to his family, Arizona, wants to do right. Wants to participate. You know, potentially wants to litigate once I explain to him all these issues that I see with the Spanish language, so I don't think he's a flight risk or a

danger to the community.

THE COURT:  Okay.  Thank you.

MR. WILLE:  Thank you.

THE COURT:  Ms. Phillips, anything else from the government?

MS. PHILLIPS:  Your Honor, just to clarify in terms of the purchase of the machine gun which was in August of this year.  The conversations with the undercover agent were with Mr. Ramirez-Zavala.  Mr. Ramirez-Zavala and the undercover agent discussed several different firearms and towards the end of the conversation, they were discussing a fully automatic firearm.

When Mr. Rivera showed up at the place to purchase the firearm, he said he was very -- he was aware of the fact that it was illegal to possess a fully automatic firearm.  He indicated that he realized it was a fully automatic firearm.  The undercover agent explained that it was illegal to all of the parties present.  And there was another firearm which I would believe was a semiautomatic rifle which is legal and they were offered that rifle as well but they chose to attempt to purchase the machine gun knowing that it was illegal.

The other individual, codefendant in this case, was also in the country illegally.  It was illegal for him to possess a firearm.  Although Mr. Rivera indicated he did not know for certain that he was in the country illegally, that

person being the codefendant, that he had reason to suspect it. So all of that I think is important backdrop in terms of what actually happened in August of 2023.

THE COURT:  Okay.  Thank you.

Mr. Wille, you get the last word if there's -- there's nothing new there but --

MR. WILLE:  Just -- just briefly.

My client is shaking his head when he hears what's their account of exactly what was communicated there.  I imagine we're going to have a lot to talk about with the Spanish language issue.  And this is going to come down to knowledge, right.  That's literally the lone issue at hand. But, again, I don't think this is an open-and-shut case and my client is looking forward to participating in all of this for that reason.

THE COURT:  Thank you.

All right.  Mr. Rivera and to your family as well, this is a close call.

The Bail Reform Act, Mr. Rivera, is what the court uses in every case.

I'd like to just tell you that this is a case about the allegation that you have been involved in firearms trafficking and not handguns but machine guns, an M-2 .50 caliber, other serious semiautomatic firearms, but high caliber dangerous weapons.  And being involved with them in some degree

or another either in June just by putting an incorrect address, maybe not intending to violate the law but, again, being involved in these very serious firearms.  I don't think there's at this point, again, with the presumption of innocence, any dispute about the government's characterization of you being involved in these.  Your attorney has a lot to argue.

The reason I start with that is the first factor under the Bail Reform Act is the nature and circumstances of the offense.  This offense involving a fully automatic machine gun which you allegedly attempted to purchase for $14,000 from an undercover is certainly dangerous to any community.  The indication here is these firearms were going to Mexico. There's references to that in the report -- or the memorandum that was submitted.  So there's no question that the nature of this offense is serious.  That favors detention.

Your history and characteristics are mixed.  You have no drug issues.  You have no criminal history.  Your family supports you.  You have strong ties to the United States, undoubtedly.  You have family.  I've read the letters from your father, your girlfriend, your sister, your mother-in-law.  You have a job that you can be released to.  You signed a lease. All of the information that's listed in your attorney's memorandum I've considered.

And then it's also undisputed that of course you have

ties to Mexico and went down there to finish a divorce.  You have some family relations there.  You were raised there.  You lived there until I think age 23 or 24.  You've been back in the United States I think for the last five years.  Is that about right, Mr. Wille?

MR. WILLE:  Yeah, I think --

THE COURT:  Five or six?

MR. WILLE:  -- five or six.

THE COURT:  Yeah.

So, anyway, you have strong ties to both countries.  That factor favors release.  There are more strong ties to the U.S. than there are in Mexico.  It's a close call.  You lived there most of your life.  But you live here now and you're a United States citizen, so that favors release.

As to this indictment, the weight of the evidence right now favors detention.  It's the least important factor.  Actually, I almost give it very little weight in a case like this.

I'm far more concerned with the nature of the allegation, it being a machine gun, than I am with the government's -- and a strong proof of this, which I think is fair.

To that extent, your attorney's correct.  He has no disclosure and you're limited in your ability to fight this at this point.  But a fair reading here is the factor does favor

detention, but it's the least important factor.

And then the nature of the danger to the community if you're released.  And this is a close call as well.  Certainly being involved in firearms trafficking, allegedly.

And, again, there's references to you being connected to the Utah case, not that you're charged but that you were a person that could be contacted to assist means this was not just one event in my mind right now in August when you were arrested and released.  You were before that known as someone who could assist in firearms trafficking.  And you can dispute that but at this hearing, the information from Utah does tend to show your codefendants, they were directing people to contact you to assist with firearms transactions.  So it's not just one event.  It involves these serious weapons.  But as your attorney said, there are conditions like electronic monitoring that might mitigate that risk.  So that factor is at this point neutral.

There are compelling reasons to think you're a danger, given the danger of these weapons.  On the other hand, there may be ways to minimize that risk.

My conclusion on these factors is this.  When it comes to flight risk, the least -- the lower of the standards by a preponderance of the evidence, I find this to be essentially a 50/50 call.  Therefore, the law requires that you be released, if that were the only consideration.

The second factor is the danger to the community. That's a higher standard of clear and convincing evidence. And in this, the government has established that, but it's a very close call. And I say that knowing that your attorney doesn't have all of the information. I don't think he has the recordings or the translations of this event in August. He doesn't have information about the weapon that you were in possession of.

I'm assuming for now that it's of no interest to me because I just have a firearm that was discharged and it hit a house and you had the firearm later. This tells me nothing about what happened. Like I said, it could be an accidental discharge. So I just wanted to know that. But it was an example of things your attorney just doesn't have information about now.

What does it comes down to? The nature of this offense and your being involved in these serious weapons on multiple occasions and being more than a minor role participant, being someone who's directly involved, I think, both in recruiting and being involved in this in multiple occasions.

So your attorney -- I'll just tell you, on cases that are this close if there's -- I'm sympathetic to the idea you don't have all the information, Mr. Wille. You just couldn't. And the government has a big advantage. But until that

information can be established that might mitigate that potential danger and his involvement in these firearms, I do find the government's met that standard at this time.

So at this time, Mr. Rivera, you're going to be detained under the standard of a danger.

There was evidence of serious risk of flight at the very beginning, but your attorney has successfully argued against that.

And maybe he has more information when he gets it that can tip the scales for you, but I have to make the decision now based on what I have.  When he has more information, he can -- he might be in a position to advocate for you and to have a more full response.  He doesn't have that information now but I can't just wait indefinitely and make a decision.  So I know that disappoints you, but this is a very serious case.  These firearms are undoubtedly dangerous.  And it's critical, as your attorney mentioned, that this involvement of potential automatic machine guns is one of the main factors that tips the scale here.

So the court's finding is detention by -- as a danger but not as a flight risk.

Anything else from the government?

MS. PHILLIPS:  Your Honor, just for the record, I just want to indicate that I did make initial disclosure to defense counsel at Bates stamp, I believe, 1 through 75 and did supply

a supplemental -- a couple of supplemental reports at his request.

THE COURT:  Okay.  I'm sure you have a lot more but thank you.

These exhibits I'll return to you.  They'll be up here.

Anything else from the defense?

MR. WILLE:  Yes, Your Honor.  I just wanted to clarify.  You found that he's a danger to the community. You're also finding that there are no conditions that could mitigate that sufficiently reasonably?

THE COURT:  Correct.

And I -- if -- based on the -- well, I appreciate that point and so let me make that determination more.

I've considered that fact, for example, electronic monitoring, but his -- he was directly linked in being involved in these on multiple occasions and I find it difficult that even something as significant as home arrest, without knowing more right now and given the seriousness of the allegation, would be sufficient.  That's why his actual role and what he knew and what he was involved in is so critical.  And I know you can't defend that now.

But -- I don't want to use inflammatory words like callous disregard for the safety of the community, but anyone involved in the trafficking of these types of weapons knowing

at least one of them -- or believing one of them was fully automatic presents such an inherent danger that that is why I don't think there are conditions like electronic monitoring, which would be the obvious choice, might normally work, but I've discounted here based on how serious I find these allegations.

MR. WILLE:  Thank you, Your Honor.

THE COURT:  That's an excellent point.

Anything else you'd like to address?

MR. WILLE:  No, Your Honor.  Thank you very much.

THE COURT:  Okay.  We are adjourned.

Thank you all for your patience.

MS. PHILLIPS:  Thank you.

(Proceedings adjourned at 2:49 p.m.)

**C E R T I F I C A T E**

I, SCOTT M. CONIAM, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 1st day of December 2023.

/s/ Scott M. Coniam
Scott M. Coniam, RDR, CRR